**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 17-284-1** |
| **MICHAEL MILCHIN** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Michael Milchin was the organizer and leader of a massive drug conspiracy that poured hundreds of thousands of highly potent oxycodone pills onto the street. The defendant conspired with several individuals, including his co-defendants in this case, to fill hundreds of fraudulent prescriptions for controlled substances, namely oxycodone and, to a lesser extent, morphine sulfate, for the purpose of redistribution to others, including street-level dealers. As a result, the defendant was indicted on drug trafficking and health care fraud offenses on May 23, 2017.

The defendant first came to the government's attention for his involvement in the health care fraud scheme that is the subject of Counts One through Six of the indictment. The defendant was the business manager at Central Bucks Health Associates (CBHA), a chiropractic office. From approximately June 2010 to approximately July 2012, the defendant and John Vira, a licensed chiropractor, conspired to defraud Independence Blue Cross (IBC) and Aetna Inc. (Aetna), through CBHA, by billing those insurers more than $700,000 for chiropractic services that were never rendered.[1]

Once the health insurers caught on to the scheme and the defendant could no longer profit from it, he moved on to a far more dangerous and cunning scheme, using the chiropractic office

---

[1]     On August 17, 2017, John Vira pleaded guilty to a one-count information charging him with conspiracy to commit health care fraud in connection with the scheme to defraud IBC and Aetna.

as a front for drug trafficking, as described in Counts Seven through Thirty-five of the indictment.[2]  From approximately May 2012 until approximately March 2015, defendant Milchin used various "runners," including his co-defendants, to obtain more than 100,000 oxycodone (30 mg) pills from various pharmacies using hundreds of fraudulent prescriptions that were ostensibly written by a physician who was purportedly associated with CBHA (the Physician), but which in fact were forged by defendant Milchin or other co-conspirators with the express purpose of using them to illegally obtain oxycodone.

All of defendant Milchin's co-defendants pleaded guilty well in advance of trial.[3]  On February 9, 2018, just days before his trial was set to begin, the defendant pleaded guilty to all counts with which he was charged.[4]  There was no plea agreement.  A sentencing hearing is scheduled for May 22, 2018.

The defendant's upcoming sentencing hearing provides an opportunity to hold the defendant responsible for his criminal schemes, in which he exploited and manipulated others, endangered the public, and openly defied the law, all for his own personal gain.  As is discussed in more detail below, based on a thorough consideration of the applicable advisory guideline range and the pertinent § 3553(a) sentencing factors, the defendant's conduct justifies a sentence of incarceration at the high end of the advisory guideline range of 135 to 168 months.

---

2       Milchin could not keep up the charade indefinitely.  Eventually CBHA became defunct and Milchin moved the drug conspiracy to the Big Apple Deli, which he owned for a short time with co-defendant Armen Khimoian. When that business also failed, the defendant ran the conspiracy out of his home.

3       Defendant Milchin was charged in the indictment along with thirteen of his drug co-conspirators.  Four other co-conspirators, Lisa Mack, Arthur Sinelnikov, Person #1 and Person #2, were charged elsewhere.

4       Defendant Milchin was charged in Counts 1 through 7 and 21 through 35 of the indictment.

I.       **BACKGROUND**

      A.       **The Health Care Fraud Conspiracy**

John Vira, charged elsewhere, a chiropractor licensed to practice in the Commonwealth of Pennsylvania, was the owner of CBHA.  In approximately June 2010, Vira began working with defendant Milchin.  Milchin told Vira that he could bring new patients to the practice.  Vira agreed to bring Milchin in as the business manager of CBHA.  In addition to bringing in new patients, Milchin was responsible for handling billing and other financial matters.  Vira was responsible for treating patients and maintaining patient files.  Vira agreed to pay Milchin 50% of revenue after overhead and other expenses were paid.

Shortly after Vira began working with Milchin, Milchin and Vira agreed to begin submitting extra claims for reimbursement to insurance companies to increase CBHA's revenue. For example, if a patient came in once a week, they agreed to bill the insurance company for a second weekly visit that did not actually take place.  Subsequently, on hundreds of occasions from approximately June 2010 through June 2012, Milchin, with Vira's knowledge and agreement, submitted, and caused to be submitted, fraudulent claims for reimbursement to IBC and Aetna, that, among other things, were supported by false and fraudulent representations that Vira had treated each beneficiary on each date billed, when in fact he had not.[5]  In total, Milchin and Vira submitted, or caused to be submitted, approximately $721,800 in fraudulent billings to IBC and Aetna on behalf of CBHA and Milchin and Vira received approximately $138,196 in fraudulent reimbursements from those claims.[6]

---

5        Specific examples of the false billing are listed in paragraph 12 of Count One of the indictment.

6        Milchin submitted approximately $676,315 in fraudulent billings to IBC on behalf of CBHA.  CBHA was paid approximately $132,025 on those fraudulent claims.  Similarly, Milchin submitted approximately $45,485 in fraudulent billings to Aetna on behalf of CBHA.  CBHA was paid approximately $6,171 on those fraudulent claims.

To hide the fraudulent billings, Vira wrote fake treatment notes in patient charts to make it seem as if the beneficiaries were treated on particular claimed dates of service when, in fact, they were not.  In a further attempt to hide the fraud and to keep the fraud proceeds coming, Vira made false statements to IBC and submitted to IBC some of the patient files that he had falsified in an attempt to support fraudulent claims that had previously been submitted to IBC on behalf of CBHA.

   B.    **The Oxycodone Conspiracy**

From approximately May 2012 until approximately March 2015, defendant Milchin conspired with numerous individuals, known and unknown, to fill hundreds of fraudulent prescriptions for controlled substances, namely oxycodone, a Schedule II controlled substance, for the purpose of redistribution to others, including street-level dealers.  The fraudulent prescriptions were purportedly written by a physician whose identity is known to the parties (the Physician).  However, the Physician did not sign or authorize the prescriptions.  Rather, beginning in approximately May 2012, Milchin, who is not a physician, obtained prescription pads in the Physician's name and Milchin and others began writing prescriptions for, among other things, oxycodone using forgeries of the Physician's signature.

Michael Milchin and other co-conspirators filled, and recruited numerous other individuals to fill, the forged prescriptions at various pharmacies in the Eastern District of Pennsylvania.[7]  The individuals who filled the fraudulent prescriptions turned the pills over to Milchin, or other individuals acting on Milchin's behalf, and were paid in cash or with a portion of the fraudulently obtained pills.  Milchin, in turn, provided large quantities of the fraudulently

---

[7]    The specific oxycodone prescriptions filled by the defendant in connection with the conspiracy are listed in ¶ 1 of the overt acts section of Count 7 of the indictment.  The specific prescriptions filled by Milchin's co-defendants are listed in ¶¶ 2-18 of the overt acts section of Count 7 of the indictment.

obtained pills to other co-conspirators, including co-defendant Ning Jian Du, to sell through street-level drug deals.

To avoid detection and to assure a continuous supply of oxycodone, Michael Milchin arranged for a telephone number under his control to be imprinted on the fraudulent oxycodone prescriptions.  Milchin then fielded, or had others, including Lisa Mack, charged elsewhere, field telephone calls from pharmacies attempting to contact the purported Physician's office to verify the prescriptions.  Milchin and Mack pretended to work at the Physician's office and confirmed the information written on the fraudulent prescriptions, including the names, dates of birth, and purported diagnostic codes for the individuals filling the prescriptions to make it seem as if the prescriptions were legitimate and to encourage the pharmacists to fill them.

Milchin's scheme worked.  During the course of this drug trafficking conspiracy, the defendant fraudulently obtained well over one hundred thousand oxycodone (30 mg) pills with an estimated street value of more than $1.5 million.

## II.   SENTENCING CALCULATION

### A.   Statutory Maximum

 The statutory maximum penalty for conspiracy, in violation of 18 U.S.C. § 371 (Count 1), is 5 years' imprisonment, a $250,000 fine, a 3-year term of supervised release, and a $100 special assessment.  The statutory maximum penalty for health care fraud, in violation of 18 U.S.C. § 1347 (Counts 2-6), is 10 years' imprisonment, a 3-year period of supervised release, a $250,000 fine, and a $100 special assessment.  The statutory maximum penalty for conspiracy to distribute oxycodone, a Schedule II controlled substance, in violation of 21 U.S.C. § 846 (Count 7), is 20 years' imprisonment, a mandatory minimum 3 years to lifetime supervised release, a fine of $1,000,000, and a $100 special assessment.  The statutory

maximum penalty for possession of oxycodone with intent to distribute, in violation of 21

U.S.C. § 841(a)(1) (Counts 21-35), is 20 years' imprisonment, a mandatory minimum 3 years

to lifetime supervised release, a fine of $1,000,000, and a $100 special assessment.

The total statutory maximum sentence is 375 years' imprisonment, a mandatory

minimum 3 years to lifetime supervised release, a fine of $17.5 million, and a $2,200 special

assessment.

### B.      **Sentencing Guidelines**

The applicable guideline for a violation of 18 U.S.C. § 371 is U.S.S.G. § 2X1.1.  The

base offense level is the base offense level from the guideline for the substantive offense that was

the object of the conspiracy.  The base offense level for health care fraud is 6.  USSG §

2B1.1(a)(2).  A conservative estimate of the fraud loss amount is $138,196 ($132,025 for IBC

and $6,171 for Aetna).  The offense level is increased by 8 points because the loss is more than

$95,000 but less than $150,000, for an adjusted offense level of 14.  USSG § 2B1.1(b)(1)(E).

Counting only the prescriptions filled by the defendant himself and by all of the co-

defendants and cooperators referenced in the indictment, the defendant was responsible for

obtaining 1,238.82 grams of oxycodone and 50.4 grams of morphine sulfate, which is equivalent

to 8,325.29 kilograms of marijuana.[8]  The applicable offense level for at least 3,000 kilograms

but less than 10,000 kilograms of marijuana, is 32.

Four levels are added because the defendant was the organizer and leader of the

conspiracy, which involved more than five participants.  USSG § 3B1.1(a).  As an initial matter,

the defendant acquired the prescriptions that were used in the scheme and came up with the idea

to use them to fraudulently obtain oxycodone pills from pharmacies.  In addition, the defendant

---

[8]      Hundreds of prescriptions were filled in connection with the conspiracy, including by individuals who, for various reasons, have not been charged.  Thus, this is a conservative calculation of the defendant's offense level.

was the only member of the conspiracy to have been involved from the very beginning to the very end.  Throughout the conspiracy, the runners dealt with Milchin, directly or indirectly, when it came to filling the prescriptions.  With very few exceptions, defendant Milchin provided the prescriptions and supplied the cash that the runners used to fill them.  The runners returned the pills to defendant Milchin or to someone they knew to be working with him.  In addition, Milchin determined what compensation the runners received for filling the prescriptions or for recruiting other runners.  Moreover, Milchin verified the prescriptions the runners filled and, when it became too time consuming, arranged for others, including Lisa Mack, to verify the prescriptions.  The defendant also profited the most from the conspiracy by selling the pills to others, including co-defendant Ning Jian Du, who, in turn, sold them to others.  Thus, defendant Milchin organized and ran the scheme, which, as charged in the indictment to which the defendant pleaded guilty, included at least 17 other co-conspirators.  A four-level enhancement for organizing and leading the conspiracy is therefore appropriate.  The adjusted offense level is 36.

Because the offense level for the health care fraud conspiracy is more than 9 levels less serious than the offense level for the oxycodone conspiracy, it is disregarded in calculating the defendant's advisory guideline range.  USSG § 3D1.4(c).

With a three-level decrease for acceptance of responsibility pursuant to USSG § 3E1.1(b), the total offense level is 33.  The defendant qualifies as Criminal History Category I.  An offense level of 33 and a criminal history category of I results in an advisory guideline range of 135 to 168 months.

In an apparent attempt to reduce the advisory guideline range and to minimize the defendant's role in the conspiracy, the defendant has lodged a host of objections to the

sentencing guidelines calculation.  The defendant's objections are frivolous and should be rejected.  Moreover, the objections call into question whether the defendant has in fact accepted responsibility for his offenses.  If necessary, the government is prepared to present the testimony of the case agent at the sentencing hearing to rebut the defendant's objections and to correct the defendant's factual inaccuracies.

### 1.    The Defendant Sold Pills in Connection with the Conspiracy

The defendant claims that he never sold any of the pills that he obtained through the conspiracy.  This is untrue.  As an initial matter, the defendant pleaded guilty to the oxycodone conspiracy charged in the indictment, which included allegations that the defendant provided large quantities of the fraudulently obtained pills to other co-conspirators to sell through street-level drug deals.  Count Seven, ¶ 10.  In addition, the defendant admitted to investigators that he sold some of the pills he obtained through the conspiracy to co-defendant Ning Jian Du.[9]  Moreover, multiple witnesses told investigators that Milchin sold the pills he obtained from the scheme and, in particular, that he sold the pills to co-defendant Ning Jian Du to sell to others.  Thus, the defendant's claim that he did not sell any of the pills is inconsistent with his guilty plea, with the defendant's own admissions, and with the statements of numerous witnesses.

### 2.    The Defendant Conspired with Co-defendant Lee and Person #2

The defendant claims that he did not conspire with Person #2 and that co-defendant Lee acted "outside of the conspiracy."  Again, both of these statements directly contradict the defendant's guilty plea and the defendant's own admissions.  The defendant pleaded guilty to conspiring with Lee and Person #2, among others.  Count Seven, Overt Acts ¶¶ 2, 5.  Moreover,

---

9    The defendant made this and various other admissions during "off-the-record" proffer interviews on October 31, 2017 and December 19, 2017.  The defendant's claim that he did not sell any of the pills obtained during the conspiracy, as well as other claims made by the defendant in his objections, directly contradicts admissions made by the defendant during his proffer and therefore opens the door for the admission of the proffer evidence by the government.

Milchin told investigators, among other things, that Person #2 taught Milchin and Lee how to write out the prescriptions and that he, Person #2 and Lee filled out the fraudulent prescriptions. Similarly, Person #2 told investigators that he, Milchin and Lee agreed to pass fake prescriptions and to recruit others to fill fake prescriptions.  Thus, the defendant conspired with both Person #2 and Lee, among others.

The defendant apparently believes that he can distance himself from Person #2 and Lee by arguing that they supervised their own runners during the course of their involvement in the conspiracy and that their conduct therefore somehow fell "outside" the conspiracy.[10]  On the contrary, the conduct of Lee and Person #2 fell squarely within the conspiracy.   Person #2 had his own recruits from the beginning of his involvement in the conspiracy.  Lee filled prescriptions and recruited others to fill prescriptions throughout his involvement in the conspiracy.  He supervised others, *i.e.,* "ran his own people," toward the end of his involvement in the conspiracy.  Whether they were recruiting runners, supervising others, or filling fake prescriptions themselves, the defendant, Person #2, Lee, and others, worked together to fill the fake prescriptions obtained by the defendant in the Physician's name.  The defendant provided blank prescriptions in the Physician's name to Person #2 and Lee for the express purpose of using them to obtain oxycodone by sending various runners into pharmacies to fill the fraudulent prescriptions, just as Milchin had done and continued to do throughout the conspiracy.  Lisa Mack verified prescriptions filled by runners supervised by Lee, just as she did for runners recruited by the defendant, which goes to show that Lee was not acting "outside the conspiracy" as the defendant claims, but as part of the same conspiracy.

---

10      Person #2 ended his involvement in the conspiracy in approximately March 2013.  Co-defendant Lee left the conspiracy in approximately September 2013.  Milchin continued until the end of the conspiracy in approximately March 2015.

Moreover, contrary to the defendant's claim that he did not "split the proceeds" with Lee, the defendant told investigators that he and Lee were "partners" and that they evenly split the profits.  Thus, the defendant, Person #2, and Lee worked in concert to fill fake prescriptions in the Physician's name as part of the same conspiracy.  The defendant's objections to the contrary are meritless.

### 3.      The Defendant is Responsible for the Drugs Obtained by Co-defendants

The defendant repeatedly argues that he should not be held responsible for the drug quantities obtained by his co-conspirators during the course of the conspiracy because, he claims, they acted "outside the conspiracy."  The defendant is incorrect.  The guideline calculations are based on the prescriptions and drug quantities included in the indictment.  Each of the co-defendants pleaded guilty to filling those prescriptions as part of the conspiracy.  The defendant pleaded guilty to the same conspiracy.  As noted above, the defendant was the organizer and leader of that conspiracy.  All of the prescriptions listed in the indictment originated with the defendant.  The defendant obtained the blank prescriptions in the Physician's name and then filled, and recruited numerous other individuals to fill, the fraudulent prescriptions at various pharmacies.  Those who filled the fraudulent prescriptions, including the co-defendants, turned the pills over to the defendant or other individuals working with the defendant.  Thus, none of the prescriptions used to calculate the drug quantity were "outside the conspiracy" as the defendant claims and the defendant is responsible for the entire drug quantity included in the indictment.

### III.    SENTENCING FACTORS

Once the Court has calculated the guideline range, the Court must next consider all of the sentencing considerations in Section 3553(a).  Those factors include: (1) the nature and

circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

In this case, a sentence at the high end of the advisory guideline range is appropriate. The nature and circumstances of the offense and the history and characteristics of the defendant support such a sentence.  The defendant committed very serious offenses for an extensive period of time.  From approximately 2010 until approximately 2012, the defendant exploited the health care benefits of numerous individuals in the scheme to defraud IBC and Aetna, resulting in a fraud loss of at least $138,196.  More seriously, from 2012 until 2015, the defendant fraudulently obtained hundreds of thousands of oxycodone (30 mg) pills and sold them to addicts and drug dealers without regard to the consequences to the end-users or the public at large.  Moreover, many of the individuals who filled the fraudulent prescriptions at the defendant's direction were drug users and addicts themselves, some of whom have since died as a result of their addictions.[11]  The defendant preyed on their addictions by offering them a cut of the oxycodone pills or cash in exchange for filling the fraudulent prescriptions. The defendant also offered these individuals additional pills or money if they recruited yet

---

11        Draft PSR ¶¶ 51 n.3, 188.

others to fill fraudulent prescriptions.  By exploiting the intensely addictive properties of oxycodone, the defendant engaged in a reckless scheme, which demonstrated extreme disregard for the safety of others and a brazen disrespect for the law.  Under these circumstances, a sentence at the high end of the advisory guideline range is justified.

Such a sentence would adequately reflect the seriousness of the defendant's offenses, promote respect for the law, and provide just punishment.  Such a sentence would also afford adequate deterrence, both to the defendant and to others.  In view of the defendant's blatant disregard for the law and his conspicuous indifference for the safety of others, nothing less than a period of substantial incarceration will convince the defendant – and others like him – to abide by the law.  Such a sentence will also serve to protect the community from further crimes of the defendant.  Accordingly, a sentence at the high end of the advisory guideline range is appropriate in this case.

**IV.    <u>CONCLUSION</u>**

For all of the reasons stated above, the government respectfully recommends a sentence at the high end of the advisory guideline range of 135 to 168 months.  This sentence addresses the serious nature of the offense and appropriately punishes the defendant.

Respectfully submitted,

WILLIAM M McSWAIN
United States Attorney


  s/Mary Kay Costello
MARY KAY COSTELLO
Assistant United States Attorney


Date:  May 15, 2018

12

## **CERTIFICATE OF SERVICE**

I hereby certify that I served on this date a true and correct copy of the Government's

Sentencing Memorandum by electronic case filing notification and first class mail on the

following:

> Arkady Bukh
> Bukh Law Firm, PLLC
> 1123 Avenue Z
> Brooklyn, NY 11235
>
> Lonny Fish, Esq.
> 1500 Walnut Street, Suite 2000
> Philadelphia, PA 19102
>
> Jacqueline S. Widmeier
> Senior U.S. Probation Officer
> United States Probation Office
> 600 Arch Street, Suite 2400
> Philadelphia, PA 19106

> s/Mary Kay Costello
> MARY KAY COSTELLO
> Assistant United States Attorney

Date:  May 15, 2018